Good morning, Your Honor. Michelle Anderson on behalf of Mr. Medina-Villa, and I'd like to request three minutes for rebuttal. Mr. Medina's conviction should be reversed for three main reasons. First, without Mr. Medina's knowledge or consent, law enforcement chose to deport the only eyewitnesses who could corroborate Mr. Medina's defense in violation of Lujan Castro. Second, Mr. Medina was interrogated without the benefit of a Miranda advisal while he was in custody. Those statements were admitted at trial, and that error was not harmless. And finally, the district court improperly sentenced Mr. Medina when it applied a 16-level enhancement under 2L1.2 for Mr. Medina's state law conviction under 288A. Now, about 30 years ago, this Court decided Lujan Castro, which guarantees a defendant's right to be informed meaningfully of his ability to retain undocumented people who the defendant thinks may have information that's favorable to him. Now, did the – in this case, though, did the – can the defendant make a plausible showing that the potential witness testimony was both favorable and material? Yes. What is that showing? He can show that the material witnesses were exculpatory in this case. The material witnesses are exculpatory when viewed in light of the defense. Mr. Medina's defense in this case was one of duress, so we must look at the material witnesses' statements in that context. When looking at the duress defense, what Mr. Medina told the agents at the time of arrest was that he was tricked by someone he knew from work. This acquaintance invited him to lunch, and to entice Mr. Medina to go to lunch, he told him about a job he could do clearing out a field near the border. Mr. Medina agreed to go with him to where the job was located, and when he got there, he started working. And while working, he contacted his family while using this friend's telephone. As it turns out, the friend was a smuggler and told Mr. Medina that he wouldn't let him leave. The smuggler and two other people told Mr. Medina he was going to have to cross into the United States illegally, and if he didn't, his family would pay the consequences. Now, it's in this context that we take a look at the material witness statements. Mr. Medina had told the agent that the smuggler and his two accomplices took him to a house where he was kept for a few days without food. When the material witnesses were interviewed, both material witnesses confirmed that Mr. Medina was already there in the house when they arrived. Mr. Medina said that before his arrest in this case, the smuggler and his two accomplices tried to make him cross into the United States on an earlier occasion. He said he turned back at the first fence and told them that he wouldn't do it, and they beat him in response. And when they forced him to go on the occasion where he was arrested, he agreed at the last possible moment to avoid further punishment. Now, unbeknownst to Mr. Medina, when the agent interviewed the material witnesses, the material witness told the agent about what the original plan was. The original plan was for the smuggler, that main smuggler, to cross those people himself. However, when it came time to execute that plan, the plan changed at the very last minute. The material witness told the agent that instead of following that smuggler, that they were to follow Mr. Medina, and there would be a white car that they would all have to jump into. Now, this corroborated Mr. Medina's statement, because if he had been part of the smuggling operation from the very beginning, that would have been the plan. Instead, the plan changed at the very last minute when Mr. Medina's will had been  So that corroborates his defense as well. I'm sorry, I don't see that what, how Mr. Medina's will was overcome is supported by, well, I'm looking at the Almeida-Hernandez witness statement, and what he says is that he told us, this smuggler told us that we were going to cross there in accordance, supposedly he was going to come with us, but when the time came to jump it, he stayed behind and told us to follow the one that was in front. Now, wasn't Medina the one that was in front? Well, this discussion is happening at the fence. So when he's identifying the person at the front, he's talking about having followed Mr. Medina across the fences. But there's no evidence in this that Mr. Medina was forced to be the one in the front and hop over the fence first, as the defense would have it. Well, I guess it's a little more subtle than that. What the material witnesses said corroborated what he told Agent Mills. Mr. Medina told Agent Mills, look, I didn't want to do this. It was only at the last second after they had beaten me once that I decided to do this. Well, Mendez Ortega, though, says he's walking and talking with the coyotes, looking normal, seeming completely normal, and he's the one who tells them to cross. And I don't see the help to you in that either. Well, I think that that's a little more elaborate than what either material witness said. What the government argues in this case, they take two statements in isolation in saying that the entirety of the statements are inculpatory. They talk about a question that they posed to material witness Almeida. It was one question. It was a leading question in which the agent suggested to Mr. Medina that he was in a good mood when he was talking to the smugglers. Well, look, let me ask you this. Even assuming that there's some minimal exculpatory value in these statements, don't you also have to show that the government acted in bad faith by deporting them? No. And there are several reasons why that is true. First, the Lujan Castro waiver, advisal, and the cases that follow that discuss the issue have, this analysis is separate from any sort of Valenzuela Bernal dream analysis. The Valenzuela Bernal case and the dream case do not cite or consider or discuss Lujan Castro. In fact, this Court has never articulated what additional harm a defendant must show once a violation of Lujan Castro has been established. And it makes sense that the good or bad faith of the government would be irrelevant. It's because the defendant's knowledge of that right is what matters when you're engaging in a Lujan Castro analysis. And this Court, in a published decision after Valenzuela Bernal and after U.S.V. Ramirez Jimenez, which was not distinguished by the government in its brief, does the analysis separately. The defendant in Ramirez Jimenez lost his motion to dismiss, pursuant to Lujan Castro, because he did not present any evidence that his Lujan Castro was invalid, not because he failed to demonstrate bad faith on the part of the government in this regard. So I think that makes sense, because with Lujan Castro, the constitutional violation is the failure to advise him in the first instance. So the good or bad faith of the government is irrelevant in this regard. Also, in discussing the exculpatory nature of the statements that the material witnesses gave, there's one additional statement that I think is important to consider. Consistent with Mr. Medina's defense, the material witness, Almeda, confirmed that there was one person giving instructions, the person who told them the plan, who changed the plan to include Medina at the last minute, who gave Mr. Medina the ladder and told him to hold it and ordered them all to run to the car on the other side. And that was the main smuggler, who was safely back in Mexico. Now, the government's reliance on those two isolated statements in the material witness's interview with the agents is unpersuasive. We've talked a little bit already about the statement that material witness Almeda said. I think it's important to pose or to point out that this was the only question posed to Mr. Medina or, I'm sorry, posed to the material witness regarding Mr. Medina's demeanor. It was a leading question. The response was a fragment sentence. It ended with, yes, he was, dot, dot, dot. He did not ask who Mr. Medina was talking to or for how long or what they talked about or any of the other details to clarify that statement. He did not ask if Mr. Medina ever seemed distressed, nervous, sweaty, or injured at any point during or after their journey into the United States, even though the agent himself had made these observations at the time of Mr. Medina's arrest. And Agent didn't ask Mr. Almeda if he had observed anything. Well, but Medina claims that he was beaten up. Yes, he did. Did he have any marks on his body? Well, I think that's an important point, Your Honor, because at the point where he was discussing with the agent why he had been forced and how he had been forced into the United States, he said, look, they beat me up. And he pulled up his shirt and showed the agent his injuries and some bumps on his head. Now, instead of sending him to the hospital, Agent Mills waited until the end of the interrogation and then at that point sent him to the hospital to have those injuries evaluated. So there's no question that the agent understood the significance of what Mr. Medina said. Do we have any other cases where people were forced to cross the border? Well, it's certainly a jury instruction, and I know that it's been raised as a defense in several other cases. I'm not sure if you're, Your Honor, thinking of one case in particular. No, I'm not. I've never really heard of a situation like this. Well, I know it has been raised successfully in the southern district where someone argued that an agent had pulled a defendant off a fence into the United States. So it's an instruction, and it's certainly a viable defense. Under U.S. v. Vallejo, I don't think it could possibly be in the area of absurd. And even if it were an absurd defense, he had the right to present it. Was he charged by the smuggler, the client? Was the client charged by the smuggler? Did he pay the smuggler money? No, no. In this case, the smugglers used him to cross with the other people, and when he was to arrive on the other side, his family was to pay for his arrival, not because he wanted to. Who were they going to pay? The main smuggler back in Mexico. Or I don't know what the arrangements are, and we don't know either, because Agent Mills didn't bother to ask that of Mr. Medina at the time he was interrogated. And we know that Mr. Medina answered all his questions, didn't refuse to answer any of his questions. Well, Medina would tell you that, wouldn't he? Would tell us who was going to pay? Yeah. Well, I think he told us that he wasn't going to pay anything. He didn't want to come into the United States. He told the agents over and over again that he was forced to cross, and then he told them how he was forced to cross. And the agents asked him questions specifically about, well, how did these folks force you to cross? He said he was beaten and they got his contact information when he called his family while he was on the Mexico side. And in that conversation, the smuggler told the family, look, Mr. Medina is going to cross into the United States and you're going to pay for it, and if you don't, the consequences are going to be bad for you and bad for Mr. Medina. So why don't we move on to the 288A issue? Okay. With respect to the 288A, at sentencing the district court found that a 16-level enhancement applied for 288A conviction under 2L1.2. Now, on appeal, Mr. Medina argued that Barone Medina was wrongly decided because it failed to consider the full range of conduct in California, which California recognizes as constituting the offense. Now, Mr. Medina also argued that the published decision in which he was the appellant, U.S. v. Medina Maella, was wrongly decided because it relied on the reasoning set forth in Barone Medina. Now, after the filing of the principal briefs in this case, this Court decided Estrada Espinoza on bonk, and we submitted a 28J letter discussing its impact on the issues here. Estrada Espinoza is an immigration case, and Medina's previous case is a sentencing case. Why isn't that a relevant distinction, particularly where Estrada Espinoza does not purport to overrule Medina Maella? Well, I think it does overrule Medina Maella. Well, it certainly never says that. It doesn't. It actually cites it with approval. It cites one phrase with approval. So go back to my actual question, which was, doesn't it matter that one is an immigration case and one is a sentencing case? No, it doesn't matter. The definition of sexual abuse for a minor in 2L1.2 is the same as for sexual abuse of a minor in 1101A43. Medina Maella's definition of sexual abuse of a minor was overruled along with Barone Medina, but the Estrada Espinoza case does not affect the case's correct holding that the definition of sexual abuse of a minor in Section 1103. So really everything rises or falls whether the en banc case of Estrada Espinoza overruled Medina's previous own case, because if not, Medina Maella controls. That's correct, but I don't see how we could come to that conclusion based on the reasoning set forth in Estrada Espinoza and also the reasoning set forth in other cases. First of all, Estrada Espinoza didn't consider the statute at issue here. It considered four other statutes having to do with statutory rape. That's true. And not this statute, which is aimed at younger persons under the age of 14. That's true, except that the same element is missing, that was missing in the statute set forth in Estrada Espinoza. The element, there are a couple of reasons why the Federal definition of sexual abuse of a minor is different under 2888, even applying the Estrada Espinoza decision. The Federal definition of sexual abuse of a minor requires a specified sexual act with another, and the Federal definition also requires a four-year age disparity between the perpetrator and the victim. Now, this is the very same element in the Estrada case, which the Estrada statutes were found to be missing. Now, you mentioned something about older teens. And I think that with that discussion in Estrada Espinoza, that part of the discussion was really dicta. What it held consistently throughout the opinion was that 2243 was the Federal definition of sexual abuse of a minor. And additionally, it comported with the ordinary contemporary and common meaning of those words. Now, Your Honor mentioned earlier that Barone Medina was not expressly overruled. However, Barone Medina expressly rejected 2243 as the generic definition of sexual abuse of a minor in 1103A43A, and Estrada expressly adopted it. Estrada found that Congress had unambiguously expressed the intent that 2243 was the generic Federal definition of sexual abuse of a minor for purposes of Taylor. Now, Barone Medina, of course, rejected 2243 as the generic sexual abuse of a minor. In this case, what was the age of the minor girl? The minor was 13. Thirteen. That's correct. But when we are looking at this case, the actual conduct in this case is not what we are looking at. What we're looking at is not what the definition of the person has to be under 14, right? That's right. So that's part of the crime. That's correct. But it's still missing the crucial element that there must be a four-year age difference between the perpetrator and the victim. Well, what's the ‑‑ if someone is tried as an adult, they're 18 or older, and the person is under 14, so why is there any question that there's at least a four-year gap, if that even matters with respect to a younger child? With respect to a younger child, Your Honor, the juvenile can be adjudicated for this offense. So I don't think that that argument is particularly persuasive. Well, you realize your argument leads to the absurd result that if 2243 does define this, that it's okay to ‑‑ that only children between 12 and 16 are protected, but children under 12 would not come within the definition. I think that there are other statutes which would cover other sorts of conduct. I don't think that ‑‑ You're arguing for this to be the generic definition. Well, it's not just my argument, though. It's the panel's argument. That would lead to an absurd result if that was the case. I think that the absurd result would not be that ‑‑ the issue is not whether in some cases violators have been involved in a predicate offense. It is whether everyone prosecuted necessarily committed a crime involving the predicate offense. And in this case, sexual ‑‑ In Estrada Espinosa, it was required that the victim be under the age of 18. And in this case, it requires that the victim be under the age of 14. But regardless, it's still missing that crucial element of an age disparity between the victim and the perpetrator. I mean, I find it almost impossible to read Estrada as requiring that with respect to younger children because of the way that it cites the cases that involve younger children. I ‑‑ that ‑‑ again, that discussion was part ‑‑ it held that that was an unnecessary part of its discussion. It found unequivocally that the Federal definition for sexual abuse of a minor is 2243. It listed off those elements. And we compare the California State Conviction 288A against those elements. And in this case, it is missing two elements in particular. The first element is that it requires a particular sort of sexual contact. And under Case Law 288A, it can be accomplished by any sort of physical touching and ‑‑ or even without physical touching between different people. The Federal definition also requires that crucial four‑year age disparity. And I think moving on to any sort of modified categorical approach is foreclosed by this case's en banc decision in Navarro, which finds that once you find that an element is missing, we don't move on to the modified categorical approach in this regard. But this particular statute that we're concerned with here, that wasn't considered by the in‑bank court. No, no. If you're referring to Estrada Espinosa, that's true. But it talks about three other similar statutes. And in its discussion of the other three similar statutes, it points out the missing elements. And it's the same missing element under the California Penal Code, which is the four‑year age disparity. It didn't specifically talk about the touching, but that is also just a cursory review of the California condition. The California law for this sort of condition shows that any physical touching, not the kind prescribed by the definition in Federal ‑‑ in the Federal definition under 2243. All right. I think you're over your time. Oh, I am. There was the additional issue with respect to Miranda that I would like the opportunity during rebuttal if I'm afforded that chance to discuss. Well, yeah, we're well aware of all the Miranda. And with that, I hope to have the opportunity to address whatever our chance of government brings up. Good morning, Your Honors. May it please the Court, Mark Rahe for the United States. I'd like to start my discussion on the deportation of the alien witnesses issue. And one thing I'd like to start out with is to try to clarify what I see as sort of an analytical ambiguity in the record right now. And it seems like the parties maybe were arguing past each other. There's this issue about whether the government needs to show bad faith. Under Valenzuela-Bernal, as interpreted and clarified by this Court in United States versus Drink, there's no question that the defendant has the burden of proof of showing both bad faith and prejudice. Now, Lujan-Castro is an entirely separate issue. And I think what the defense would have this Court find is that Lujan-Castro gives rise to some independent right that can be enforced under the Fifth or Sixth Amendment that it imposes an affirmative obligation on the government to advise the government doesn't make that advisable. That's a violation right there. Dismiss. End of story. Well, really what they seem to be arguing is that the decision about deportation and the decision as to whether these witnesses have potentially exculpatory material shouldn't rest entirely with the Border Patrol agents. That's what they seem to be arguing. And that would mean what you're saying, that in every case, before they were deported, their statements would have to be given to an attorney, and then Lujan would require a meaningful waiver after being advised of what the witnesses did say, as opposed to kind of conflating the rule that if they can't show after the fact that there's a plausible and they can't make a plausible showing that the evidence was favorable and material, then they're not prejudiced, so no waiver need have been required. So it's kind of a circular argument. It really goes to who gets to decide whether this evidence is material and favorable, and is it decided before the trial goes forward or later on appeal? And that's what I'd like you to address. Okay. Well, I think it does have more of a retroactive look. And the way I see it, I hear what Your Honor is saying, but I still think there's a difference. Lujan, we're saying if no constitutional right was violated in the first place, then you don't need a waiver. And the analog I would draw would be to Miranda. Even though Miranda does impose the freedom of obligation, if there's no custody, you don't need a Miranda waiver. Now, maybe in an abundance of caution, the government in every single case where a law enforcement officer talks to a defendant gets a Miranda waiver. If you have that waiver and it's knowing, intelligent, and voluntary, there will never be a problem. But that's not what the law imposes. It only says you only do Miranda if there's custody and interrogation. Here, this is the first time I've really had to look at Lujan Castro in depth. The case is 30 years old. I run it on less law. It only shows up in maybe eight or nine subsequent cases. I have yet to see one that says under Lujan Castro, agents always have an affirmative obligation to advise of this right. And, in fact, Lujan Castro itself didn't hold that. It held, one, that there was a waiver and it was knowing, intelligent, and voluntary, and the other holding was that you wouldn't need the assistance of counsel or presence of a magistrate. And, I mean, that's the only reason I wanted to clarify this, because I agree with the defense. You don't need to show bad faith when you talk about knowing, intelligent, and voluntary waiver. But what the government's position here is, and there was no waiver here, so there's no factual findings to be made. We're saying under Valenzuela-Bernal, those two prongs weren't met, and, therefore, there was no violation of the Constitution. And under Valenzuela-Bernal, then you – there is a requirement of both the material and bearable testimony and bad faith. Exactly. And that's what the Court – this Court held in Dring. Your Honor wrote an opinion in Peña Gutierrez that held the same thing. The Armenta case that we cite, that law is clear. So bad faith and prejudice have to be shown. And in this case, the district court found in Excerpt of Record 90 that there was no bad faith. And I – and that, according to the Velarde-Gavarrette case, 975 F. 2nd at 676, that's reviewed for clear error. And that's a high standard. And I don't think on this record the defense has come close to meeting that high standard. And the case law talks about two ways to measure bad faith in these situations. The first one they ask is, has the government departed from normal deportation procedures? And although the defense alleges as much, there is no evidence of that in the record. And, in fact, when you look at their brief, their opening brief at page 51 and their reply brief at page 15, they make the same record citation for their claim. And what it is, it's Excerpt of Record 8889. When you read that, it's not evidence, it's not a testimony. It's the statement of the defense counsel below. And there's two things about it. I mean, one, the statement of counsel is not evidence. And, two, when you read that statement, he's saying in 1324 cases, the government's procedure is to at least get a noncaster waiver. Well, this isn't a 1324 case. So in that sense, there's no evidence that the government departed from its normal procedure. The other way that you show bad faith is whether the government deported the aliens to gain an unfair tactical advantage at trial. And, again, there's no evidence of that here. And, in fact, as we point out, the agent did interview these witnesses. Now, granted, the defense would take issue almost on a trial level of scrutiny that, oh, there's a leading questions. He didn't flesh out my defense. Well, the last I checked, it's not the duty of law enforcement to create an affirmative defense for a defendant. And in this case, Agent Mills asked both aliens. None of them had anything even remotely to say about duress. And the interesting thing about that is I know defense is putting their best foot forward on materiality, but I think some of the questions in the Court already reflect there was absolutely nothing that these witnesses said that corroborated the duress defense. And one of the most crucial facts to keep in mind here is that all the facts predicated to the so-called duress defense by the defendant's own admission took place days before the arrest. And that's at Executive Order 24-27. It's talking about a few days before, oh, I met somebody. I thought it was my friend. He invited me to have tacos. It turns out we went to Clearfield together. Next thing I know, I'm calling my son. His battery is dead. He loans me another phone. I speak to my family. He calls my family back, threatens me. They hold me in a house for days without food. And now let's go forward a few days to the day of the arrest. Both of these material witnesses testified, and this is at Executive Record 41 and 50, that they had never met this defendant before and they had only seen him the last two or three hours before the arrest. Now Valenzuela Bernal talks about when it discusses materiality, it says, look, we know since the defense never had a chance to have the opportunity to interview, it's a more relaxed standard. But still, it's not an impossible one and it has to be shown. And what it says, the defense has to be able to point to events that these witnesses could testify to. If somebody could elucidate me, I would love to know how, when you have all these predicate facts happening two to three days before, how two witnesses are supposed to be able to testify that when they've only known the defendant two to three hours. And when they said he appeared to be normal and that he was chatting with the smugglers. I think on that record, there is no materiality. And another thing I would ask the Court to keep in mind, aside from Valenzuela Bernal, 458, United States at 871, this defendant never said that either one of these two witnesses could help his duress defense. And I think that's important, because the defense points out in their brief, the defendant was very cooperative. He spoke with these agents at length. He didn't want that interview to end. And yet, when you look at that transcript, does he ever once say, either one of these witnesses, oh, that gentleman over there, he saw something he could help me know. And he didn't. Counsel, before you run out of time, could you comment also on the Section 288A issue on sentencing? Absolutely. And, Your Honor, I know this panel, I believe, has another case before, Vanegas Zamora, where it took briefing on this. There has been no briefing from the government on this issue since Estrada. I did write the brief in that case, and I'm happy to address the Court's questions. I think you've already hit it on the head. Estrada Espinoza, first off, not a criminal sentencing case, and it didn't address those statutes. Now, we're not asking you to say simply based on that alone, let's don't overrule 10 years of case law. No. There's a case that we cite, United States v. Gomez-Leon. It was decided a year ago, and it's all about the Taylor categorical approach, and it gives some nice clarity to what is definitely a difficult-to-apply context. And what is Gomez-Leon? What's its most important point? It says the term crime of violence has different meanings depending on the context. If it's a statute, it's one thing. If it's a guideline, it's another. In this case, the 16-level definition for sexual abuse of a minor is defined by a commentary note that makes no mention whatsoever of Title VIII definition. What was Estrada Espinoza interpreting? 8 U.S.C. 1101A43A. That would apply to the 8-level enhancement under the guidelines. But the plus 16 definition makes no mention of incorporating that statutory definition. And as our brief in the Venegas-Zamora case points out, when the guidelines know when they want to incorporate a statutory definition, they know how to do so. And there's absolutely zero mention of that. And I know I have a – I can already anticipate what the defense will say is that Estrada Espinoza rejected a similar argument, where the government in that case said – almost a similar argument. It said when Title VIII definition of aggravated felony wanted to incorporate a statutory definition, it knew how. And then the En Bond Court rejected that. But there's a key distinction. Congress wrote both the definitions at issue in Estrada Espinoza, both Title VIII U.S.C. 1101A43A and 18 U.S.C. 2243. So it's one thing for the En Bond Court to say Congress meant in sexual abuse of a minor under Title VIII the title that it had or the elements that it had at 2243 of Title XVIII. This is the guidelines. This is the sentencing commission. This case – the case law has never said that what Congress says is exactly what the commission means. And even though the commission was created at the behest of Congress, it stands on its own and it makes its own independent judgments. So under Gomez-Leon, if we look to the context, and we're supposed to pay close attention to that, it is not that there's an automatic carryover from an immigration case that wasn't even addressing these statutes to the plus 16. And furthermore, I would submit to the Court, the definition of the plus 16 has its own well-settled meaning under the case law of the circuit. There's those – there's that laundry list of offenses under that application note. If it was an offense in common law, you go with the majority state usage. If it was not a traditional crime in common law, you go by the ordinary contemporary meaning. And as we point out in that supplemental brief in the other case, this Court decided a case called United States v. Trinidad Aquino. It said when you talk about the ordinary contemporary common meaning, it is broader than just one statute. So when – and the Court looks at this case law of this circuit, and number once is it said that the plus 16 sexual abuse of minor has to be tethered to one statutory definition in particular, let alone the one in 18 U.S.C. 2243. And one other thing I would point out, I believe it's in the 28-J letter. We haven't had a chance to reply. We're happy to submit the supplemental briefing. I have a feeling this Court will decide it in that other case. But there is a report that the defense cites, a sentencing commission report. If you look to that report, it says that Federal prosecutions for sexual abuse of minor only account for 1.6 percent of all national prosecutions for that particular crime, for child abuse crimes. It may be one thing in the Federal context to have a uniform Federal definition. And banishment is a severe penalty. And I'm not saying a plus 16 isn't a severe penalty either. But I think the framers of the commission, when they talk about sentencing enhancements, they know they're going to be dealing with predicate convictions from all 50 States. And so if you're going to apply the ordinary contemporary common meaning, it ought to be broad enough to include more than just 1.6 percent of all Federal prosecutions. And that would be another absurd result to point on to the ones that we already talked about. And this is an important issue. There are a lot of these cases. I guess the last thing I would say, if Estrada Espinoza wasn't criminal, if it wasn't even applying to the statute at issue here, there is no reason for this Court to go out on a limb to try to afford leniency to not only undocumented aliens, but ones with child abuse prior convictions. That's the ultimate absolute result. And unless this Court has any other questions, I would submit. Thank you, counsel. All right. Go ahead. We'll give you a minute. Thank you. The only comment I wanted to make with respect to Lujan Castro was a comment that Mr. Vahey made at the end. He said that, look, when Mr. Medina sat down and spoke with the agents, he didn't say, hey, look, all those witnesses can help me. That's the point of a Lujan Castro advisal. The advisal tells the defendant, look, these folks might have favorable information for you. And if they do, they can be compelled to remain in the United States and testify on your behalf. And we have, the U.S. Government has, the discretion to deport these witnesses. And if we do, you can never compel these witnesses to come back. This is an important right, a right of great magnitude, and does not require bad faith. Valenzuela-Bernal didn't require that of Lujan Castro advisals, and Dring also does not require bad faith in the Lujan Castro advisal sense. Also, Dring is just distinguishable on its facts. In Dring, there were 11 deported witnesses. There was no sense of what those witnesses might say. They were potentially exculpatory, not actually exculpatory, where the witnesses here are actually exculpatory. And also, in Dring, the defendant was able to present an eyewitness. And so the Dring court found that the additional witnesses would have been cumulative. That's not the case here. Now, with respect to the sentencing issue, I wanted to point out the other cases that have come to all of our attentions, and that's Rodolfo Bence, which is 07-50541, Venegas Zamora, and there's another case as well that's on a petition for rehearing, and that is Solorio Munoz. And the government made a point that when predicate offense under one approach is not necessarily a predicate offense under another approach, and that's the case of USB Gomez-Leon. And while that may be true, this result is compelled by expressed differences in the definitions of the same term. This case, however, involves the identical phrase, sexual abuse of a minor, and I think the absurd result would be to find that sexual abuse of a minor in the immigration context means something different than sexual abuse of a minor in the guidelines context. The history behind the development of these areas of law shows that the cases constantly cross-reference one another. So I don't think that that argument, that 2L1.2 and the definition under 1101A43 is compelling. And the subsequent case law shows that these terms are used interchangeably. So I think it compels the result. Kennedy. But we got your argument. Okay.  Thank you. Number three, U.S. versus Tsang. Thank you.
judges: Pregerson, Graber, Wardlaw